# AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Robert Kukovec**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with Homeland Security Investigations (HSI) within the United States Department of Homeland Security (DHS). I have been employed as a Special Agent since April 2002, and I am currently assigned to the HSI office in Columbus, Ohio. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search or seizure warrant. I am currently assigned to a multi-jurisdictional narcotics task force in the central Ohio area, and I am cross designated to investigate violations of Title 21 of the United States Code. Prior to my employment with HSI (and formerly U.S. Customs), I was employed as a police officer in the state of Ohio for approximately 8.5 years. My responsibilities and duties include the investigation and enforcement of federal laws and regulations related to customs and immigration violations, including but not limited to narcotics, financial crimes, fraud, and violations of the Immigration and Nationality Act.

2. The information set forth in this affidavit is based upon my knowledge, training, experience, and participation in investigations involving the smuggling, possession, distribution, and storage of narcotics and narcotics proceeds. This information is also based on the knowledge, training, experience, and investigations conducted by fellow law enforcement officers, which have been reported to me either directly or indirectly. I believe

this information to be true and reliable.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Your affiant did not withhold any information or evidence that would negate probable cause.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

3. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — five (5) cellular phones and a black LBSTAR micro recording camera in the shape of a tiny cellular phone (**TARGET DEVICES**) as more fully described in Attachment A, incorporated herein by reference — which are currently in law enforcement possession, and the forensic extraction/examination from that property of electronically stored information more particularly described in Attachment B, which is incorporated herein by reference.  The **TARGET DEVICES** were all previously seized during the arrest of Sa'd Malik WATKINS on a federal arrest warrant as well as during the execution of a search warrant at his residence after his arrest on August 12, 2024, in Columbus, Ohio.  The **TARGET DEVICES** were seized by HSI Columbus and then turned over to the Westerville Police Department (WPD) for future examination.  The **TARGET DEVICES** are currently located/stored at the WPD Property Room in Westerville, Ohio.

4. Based upon the information contained within this affidavit, I have probable cause to believe that inside the **TARGET DEVICES** there is stored electronic communications/data that constitutes evidence of the commission of a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and property designed or intended for use, or which is or has been used as a means of committing a criminal

2

offense. Specifically, I have probable cause to believe that within the **TARGET DEVICES** there is evidence of violations of 21 U.S.C. § 841(a)(1), knowingly or intentionally distribute and possess with intent to distribute a controlled substance and 21 U.S.C. § 846, conspiracy to distribute and to possess with intent to distribute a controlled substance (the "Target Offenses").

## PROBABLE CAUSE

5. In 2021, investigators with the Westerville Police Department (WPD) received information from several confidential sources that Sa'd Malik WATKINS was supplying several drug houses around the central Ohio area with large amounts of narcotics. Based on this information and further investigation by multiple different federal, state, and local law enforcement agencies, investigators developed information about a large-scale drug trafficking organization (DTO) operating in the central Ohio area distributing bulk fentanyl, methamphetamine, cocaine, heroin, and marijuana obtained from Mexico to various local narcotics dealers throughout the Southern District of Ohio. WATKINS was identified as one of these local DTO members. WATKINS has a history of drug trafficking offenses and associates of WATKINS have numerous previous encounters by law enforcement resulting in the seizures of various narcotics. WATKINS was specifically known for supplying and distributing a signature "purple" colored fentanyl powder. Homeland Security Investigations in Columbus, Ohio (HSI Columbus) and the Delaware County Drug Task Force (DCDTF) joined the WPD in reference to the investigation of WATKINS.

6. The Columbus Police Department (CPD) also advised investigators that WATKINS was a target of their investigation back in 2019. Their investigation revealed that Cory JEWELL was stopping at a location where WATKINS was residing at 70 McMillen

Avenue in Columbus, Ohio to pick up narcotics to sell from his own residence in Columbus, Ohio. Investigators were also provided information from three (3) confidential sources that WATKINS was providing large amounts of narcotics to Deidre Dawn SOLER who lived at 3281 Eisenhower Road in Columbus, Ohio, and who was linked to 70 McMillen Avenue.

7. In September 2022, based on the investigation into SOLER and other related suspects, the DCDTF and HSI Columbus executed State of Ohio search warrants at 70 McMillen Avenue (Apartment A and Apartment C) in Columbus, Ohio. During the search of these two (2) apartments, investigators located large amounts of illicit narcotics that were believed to be supplied by WATKINS, including "purple" fentanyl. In Apartment C, investigators recovered 480.38 grams of fentanyl, 353.76 grams of methamphetamine, 92.92 grams of fentanyl analogue, 18.62 grams of cocaine, seven firearms (one reported stolen), magazines, ammunition, $1,245 in U.S. currency, a blender, and multiple cellular phones. In Apartment A, investigators recovered 12.77 grams of fentanyl, 1.06 grams of a fentanyl mixture, approximately one (1) gram of methamphetamine, a kilogram press, narcotics packaging, and ammunition. SUSPECT #1, an individual linked to the apartments, advised investigators that WATKINS was SOLER's supplier for drugs at both 3281 Eisenhower Road and the apartments at 70 McMillen Avenue.

8. In October 2022, the WPD executed a State of Ohio search warrant on SOLER's residence at 3281 Eisenhower Road in Columbus, Ohio. Investigators located and seized 1,076.06 grams of methamphetamine, 483.18 grams of fentanyl (404.01 grams consisting of "purple" fentanyl), 59.63 grams of cocaine, Buprenorphine strips, nine (9) firearms, suspected marijuana, approximately $8,000 in U.S. currency, cutting agents, drug packaging materials, and four (4) cellular phones. Investigators eventually interviewed both

SOLER and another suspect (SUSPECT #2) who resided and/or operated out of 3281 Eisenhower Road in Columbus, Ohio. SOLER advised that several suspects were selling narcotics out of her residence at 3281 Eisenhower Road, and that "maybe" she was as well. SOLER stated WATKINS had recently purchased a "club" (later determined to be the LV Lounge & Grill). SUSPECT #2 advised investigators that they were getting "purple" fentanyl from WATKINS in chunks, and they were pressing it in Apartment A on McMillen Avenue before it got "raided." SUSPECT #2 also stated that SOLER would meet WATKINS in the area of Polaris Parkway at least twice a week to pick up drugs from him. The apartment where WATKINS had been staying at that time was located near Polaris Parkway at 918 Chillingham Drive in Westerville, Ohio (The Ravines at Westar).

9. Ring video obtained from inside SOLER's residence during the search warrant at 3281 Eisenhower Road in Columbus, Ohio also showed WATKINS meeting with SOLER inside the house in September 2022. During that same time frame, text messages obtained from SOLER's phone to SUSPECT #2 revealed she was telling him/her that WATKINS was there and that he could "friend you 10 purple" (meaning loan or "front" him/her "10" of the "purple" fentanyl based on your affiant's training and experience). Further review of SOLER's text messages revealed that WATKINS was supplying SOLER with "purple" fentanyl. Further review of the Ring video from inside SOLER's residence from September 1, 2022, through October 19, 2022, revealed numerous conversations that involved WATKINS (also known as "D"). The conversations included getting money to WATKINS and picking up narcotics from WATKINS. SOLER died of a drug overdose in January 2023.

10. Between July 2023 and December 2023, electronic surveillance of WATKINS observed him at the following locations on numerous occasions: Antigua Drive at the Island

Club Apartments in Columbus, Ohio; Liberty Street at the Liberty Place Apartments in Columbus, Ohio; Riding Club Lane in Whitehall, Ohio; the LV Lounge & Grill; and at his listed address at 2101 Argyle Road in Columbus, Ohio.

11. In early February 2024, investigators were contacted by CPD, who advised that WATKINS was observed coming and going from the Liberty Street Apartments in Columbus, Ohio. CPD had a confidential informant (CI) in a different case that ran into WATKINS, and WATKINS was allegedly in possession of a large amount of "purple" fentanyl in this apartment. CPD also advised that they observed WATKINS at the Liberty Street Apartments on several occasions while conducting surveillance on JEWELL in a separate narcotics investigation, and they believed that JEWELL appeared to be associated with WATKINS.

12. A CPD analyst provided investigators with WATKINS' social media information (TikTok account "sajefebitch") where there were several videos of WATKINS holding a significant amount of U.S. currency. WATKINS was also in photos with JEWELL and Dustin BABCOCK, who resided in another apartment at the Liberty Street Apartments. All three subjects were in a video showing them in New York City with BABCOCK wearing a red Big Baller Entertainment sweatshirt. Big Baller Entertainment LLC was a business established by WATKINS. A confidential source advised investigators that WATKINS purchased a large gold and silver necklace with unknown gemstones that said "Big Baller Entertainment" for approximately $50,000 in cash while in New York City during that time.

13. On February 21, 2024, CPD executed a search warrant at 220 Liberty Street, Apartment 10206, in Columbus, Ohio that was linked to JEWELL. During the search, investigators discovered and seized 2,533.86 grams of fentanyl (547.92 grams "purple" fentanyl), 79.96 grams of Psilocyn mushrooms, ten (10) firearms, ammunition, magazines,

suppressors, miscellaneous paperwork, a drug press, a Tyvek suit, a vacuum sealer, and other narcotics related equipment. This was also the apartment that WATKINS had previously been observed leaving by CPD. The billing address for the apartment came back to 2101 Argyle Drive in Columbus, Ohio, which was the home address listed for WATKINS.

14. The CPD Lab examined fingerprints that were located on a vacuum sealer located in the bedroom where the narcotics and a firearm were found during the search warrant at 220 Liberty Street, Apartment 10206, in Columbus, Ohio. The examiner found that the latent prints were a match to WATKINS. Further lab results from the Ohio Bureau of Criminal Investigation and Identification (BCI&I) Lab discovered fingerprints located on documents found inside the bag that contained the fentanyl, which were a match to WATKINS as well. There was also DNA collected from the Tyvek suit located in the same room as the narcotics in the apartment, and the DNA was a match to WATKINS.

15. While conducting electronic surveillance in March 2024, WATKINS' red 2021 Mercedes-Benz GLE (Ohio registration KDB2362), was observed on numerous occasions at The Pierce Apartments (321 E. Capital Street), Antigua Drive, his address at 2101 Argyle Drive, and the LV Lounge & Grill all in Columbus, Ohio. WATKINS went to the LV Lounge & Grill almost daily which was owned/operated by him based on the business records, but the liquor license appeared to still be pending approval and filed under his mother's name since he was a convicted felon.

16. A review of subpoenaed documents received from the manager at The Pierce Apartments (321 E. Capital Street in Columbus, Ohio) indicated that WATKINS appeared to be currently living in Apartment #611 at that location based on video surveillance from the apartment complex. WATKINS parked his red 2021 Mercedes-Benz GLE (Ohio registration

KDB2362) on the third floor in an assigned parking space. The lease documents for this location indicated the lease was in the name of "Yanina Green." The move in date was in mid-December 2023, and the driver's license and social security number listed in the rental paperwork did not return to "Yanina Green." This appeared to be another fraudulent name used to rent an apartment for WATKINS. The phone number listed for the billing information was WATKINS' phone number. Video surveillance from The Pierce Apartments indicated WATKINS was the primary resident at this location based on historical surveillance videos.

17. In March 2024, investigators discovered from a reliable CS who was able to confirm that WATKINS was living at The Pierce Apartments in Columbus, Ohio. The CS also stated that the narcotics located at the Liberty Place Apartments during the CPD Narcotics search warrant belonged to WATKINS, and that he still owed $50,000 to a Hispanic male for that seized fentanyl. Per the CS, WATKINS purchased kilograms of fentanyl and then he turned one (1) kilogram into two (2) kilograms by cutting it and then repressing the fentanyl. During the search warrant at the Liberty Place Apartments, investigators did discover cutting agents as well as a drug press. Other information developed by investigators during the course of the investigation indicated that WATKINS would make the fentanyl purple in color when he cut it and repressed it as a type of personal signature or trademark.

18. The CS stated that WATKINS would rent his apartments under fake names using fraudulent documents he would receive from a female by the name of "China." The CS also advised that the LV Lounge & Grill was owned and operated by WATKINS as the CS had been in this location multiple times. The CS also stated that WATKINS would frequently stop at his house at 2101 Argyle Drive in Columbus, Ohio. The CS advised investigators that

WATKINS had a hidden area at the Argyle Drive residence in the floor just past the front door where he would store narcotics and/or narcotics proceeds.

19. In April 2024, investigators continued to receive information from a reliable CS who had previously provided information about WATKINS. The CS advised that he/she observed a known individual arrive at the LV Lounge & Grill to meet with WATKINS. WATKINS provided the known individual with an unknown amount of narcotics. The CS stated that WATKINS was possibly storing the narcotics at the LV Lounge & Grill in the back room as he/she saw him take a significant amount of money into the back room that came in from a suspected drug house, and since WATKINS also supplied the narcotics from the back room.

20. On April 22, 2024, HSI Columbus obtained a search warrant for the installation and monitoring of a tracking device on the red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) belonging to WATKINS through the U.S. District Court in the Southern District of Ohio. Prior to this, all tracker warrants, and any other court orders and warrants, were obtained through the State of Ohio by the WPD.

21. WATKINS continued to engage in the same pattern of activity and continued to utilize his red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) to conduct his drug trafficking activities. Based on several cooperating sources, WATKINS was still utilizing both the 2101 Argyle Drive and the LV Lounge & Grill, both in Columbus, Ohio, to continue to breakdown and/or distribute fentanyl, and his apartment at 321 E. Capital Street, Apt. 611, in Columbus, Ohio to stay and reside in overnight. In late May 2024, investigators conducted a controlled buy of 103.20 grams of "purple" fentanyl from WATKINS at the LV Lounge & Grill utilizing another CS. WATKINS arrived at the LV Lounge & Grill in the red Mercedes-

9

Benz GLE to conduct the transaction with the CS inside the business. WATKINS provided the CS the fentanyl up front to be paid back later after the CS sold the fentanyl.

22. On June 7, 2024, HSI Columbus obtained a renewal for the search warrant for the installation and monitoring of a tracking device on the red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) belonging to WATKINS through the U.S. District Court in the Southern District of Ohio.

23. Since that time, WATKINS continued to be engaged in the same pattern of activity and continued to utilize his red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) to conduct his drug trafficking activities. Based on several cooperating sources, WATKINS was still utilizing both the 2101 Argyle Drive and the LV Lounge & Grill, both in Columbus, Ohio, to continue to breakdown and/or distribute fentanyl, and his apartment at 321 E. Capital Street, Apt. 611, in Columbus, Ohio to stay and reside in overnight. In June 2024, investigators provided the CS with $4,500 to pay WATKINS for the fentanyl that was previously "fronted" to the CS in May 2024. WATKINS arrived at the LV Lounge & Grill in his red Mercedes-Benz GLE to meet with the CS inside the business to collect the money.

24. On July 22, 2024, HSI Columbus obtained a renewal for the search warrant for the installation and monitoring of a tracking device on the red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) belonging to WATKINS through the U.S. District Court in the Southern District of Ohio.

25. During surveillance, WATKINS was never observed going to any place of employment on a daily basis, except for the LV Lounge & Grill. However, there was hardly any traffic in and out of that business to support its operation.

26.     A review of tax records received from the Ohio Department of Taxation for the last several years indicated that WATKINS had not filed any taxes or reported any income, either personally or through any of his listed businesses (including the LV Lounge & Grill). However, WATKINS had numerous photographs of himself on social media with large amounts of cash and expensive, flashy jewelry like the "Big Baller Entertainment" necklace he purchased last summer for approximately $50,000 in cash in New York City.

27.     Based on your affiant's training and experience, drug traffickers often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" or fraudulent identifications to obtain residences, telephone service, utility service, and other services to hide the true identity of the owner or person who will use the residences or services.

28.     In August 2024, investigators obtained a search warrant for WATKINS' residence at 321 E. Capital Street, Apt. 611, in Columbus, Ohio through the U.S. District Court in the Southern District of Ohio

29.     On August 12, 2024, investigators executed a federal arrest warrant for WATKINS via an indictment through the U.S. District Court in the Southern District of Ohio for violations of 21 U.S.C. § 841(a)(1), knowingly or intentionally distribute and possess with intent to distribute a controlled substance and 21 U.S.C. § 846, conspiracy to distribute and to possess with intent to distribute a controlled substance in the parking garage of The Pierce Apartments at 321 E. Capital Street in Columbus, Ohio. At the time of his arrest, WATKINS was in possession of a **white Apple iPhone 12 (IMEI #353044118461228)** and a **black Apple iPhone 15 Pro Max (IMEI #3515034004487850)**. After WATKINS was taken into custody, investigators executed a search warrant at his residence at The Pierce Apartments (Apartment

11

611) and seized a loaded firearm, approximately 23 grams of psilocybin mushrooms, various drug paraphernalia, a digital scale, approximately $1,000 in cash, a money counter, numerous expensive pieces of jewelry and sunglasses, one (1) **black LBSTAR micro recording camera in the shape of a tiny cellular phone**, and three (3) cellular phones: a **silver Apple iPhone Pro Max (IMEI #352846113808513)**, a **black Apple iPhone SE (IMEI #356552964084198)**, and a **black LG cellular phone with a cracked screen (unable to locate the IMEI number)**. These five (5) cellular phones and the micro recording camera comprise of the listed **TARGET DEVICES** in Attachment A.

30. Based on your affiant's training and experience in narcotics investigations, narcotics traffickers typically rely on their cellular phones to conduct their drug business and change phones regularly to avoid detection or monitoring. Narcotics traffickers tend to utilize cellular phones to communicate with narcotics customers, as well as sources of supply and others providing support in their narcotics distribution operation. Your affiant has learned through training and experience, individuals conducting this business will maintain customers' and/or sources' telephone numbers in their phones along with text messages and other data useful in their operation. Throughout the course of this investigation, WATKINS was observed or confirmed to be utilizing his cellular phones to conduct his narcotics business based on recovered communications from other defendants' phones, source information, and the controlled buy of fentanyl by investigators from WATKINS in May 2024. Your affiant believes there is probable cause to believe that evidence of violations of the Target Offenses may be contained on the above listed **TARGET DEVICES**.

31. The **TARGET DEVICES** are currently in the lawful possession of HSI Columbus and the WPD, and they came into investigators' possession in the following way:

seized during the federal arrest of WATKINS on August 12, 2024, at or near 321 E. Capital Street in Columbus, Ohio and during the search warrant at 321 E. Capital Street, Apt. 611, in Columbus, Ohio on that same day. Therefore, while HSI Columbus might already have all necessary authority to examine the **TARGET DEVICES**, I seek this additional warrant out of an abundance of caution to be certain that an examination of the **TARGET DEVICES** will comply with the Fourth Amendment and other applicable laws.

32. The **TARGET DEVICES** are currently in storage at the WPD Property Room in Westerville, Ohio. In my training and experience, I know that the **TARGET DEVICES** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICES** first came into the possession of HSI Columbus.

## TECHNICAL TERMS

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

    A. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers

in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

B. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

C. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable

14

  media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

D. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

E. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable

15

storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

F. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

G. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

H. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

34. Based on my training, experience, and research, I know that the **TARGET DEVICES** may have capabilities that allow them to serve as "a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device(s).

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

36. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICES** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICES** because:

A. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

17

B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F. I know that when an individual uses an electronic device to facilitate the trafficking of controlled substances, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of

18

committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

37. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET DEVICES** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET DEVICES** to human inspection in order to determine whether it is evidence described by the warrant.

38. *Manner of execution*. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## REQUEST FOR SEALING

39. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organization as not all the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via

the internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

40. Based on the facts set forth in this Affidavit, there is probable cause for a search warrant authorizing the examination of the **TARGET DEVICES** described in Attachment A to seek the items described in Attachment B.

Robert Kukovec
Special Agent
Homeland Security Investigations

Digitally signed by ROBERT KUKOVEC
Date: 2024.08.15 14:00:29 -04'00'

Subscribed and sworn to before me on this   15   day of   August  , 2024.

Kimberly A. Jolson
United States Magistrate Judge